THE PEOPLE OF THE STATE OF NEW YORK, Appellant, v RALPH LEICHTWEIS et al., Defendants, and MICHAEL BELVEDERE, Respondent.

Second Department, November 21, 1977

384

APPEARANCES OF COUNSEL

*John J. Santucci, District Attorney (Gary C. DiLeonardo* of counsel), for appellant.

*Lyon & Erlbaum (Herbert A. Lyon* of counsel), for respondent.

## OPINION OF THE COURT

MARGETT, J.

The People appeal from so much of an order of the Supreme Court, Queens County, dated April 5, 1977, as dismissed those counts of an indictment which charged respondent with burglary in the third degree and attempted grand larceny in the second degree (counts one and two respectively). With respect to the count of the indictment charging burglary, the issues before us are (a) whether the testimony before the Grand Jury established that respondent and his codefendants (hereafter collectively referred to as defendants) had consent to enter the premises and, if so, (b) whether respondent *believed* he had consent to enter the premises. With respect to the count of the indictment charging attempted grand larceny, the issue is whether the evidence before the Grand Jury was sufficient to establish that respondent engaged in conduct which "tend[ed] to effect the commission" of the grand larceny. The order should be reversed insofar as it is appealed from and the said counts should be reinstated.

The Grand Jury heard testimony to the effect that a security officer assigned to Swissair's hangar at Kennedy Airport was approached on numerous occasions in the spring of 1976 by defendant Mazzapella, who indicated an interest in securing entry to the hangar and in taking money from the safe therein. The security officer, Lee Powell, was offered the chance to make some money if he co-operated.

During the course of these conversations, Powell was asked, in increasing detail, about the alarm system in operation at the hangar. Powell reported these conversations to his supervisor, the head of security at Swissair.

Mazzapella's contacts with Powell continued for several months and on three occasions in September and October, 1976 Mazzapella was let into secured areas of Swissair's property by Powell. On two of these occasions, Mazzapella inspected safes and their alarm mechanisms. Powell had been in continual touch with his supervisors and the police had

been alerted. Indeed, by the time Mazzapella was permitted into the hangar, one gate was manned by an undercover police officer posing as a security guard.

On October 21, 1976 Powell met Mazzapella and defendant Belvedere at a restaurant in Brooklyn. Belvedere had numerous questions about the safes and also wanted to know whether the other guard on duty at the hangar would go along with their scheme. He told Powell to be prepared to be pressured by the police, and further told him that he would be sent his share of the proceeds in about two years.

On October 26, 1976, at about 12:45 A.M., Belvedere and Mazzapella were let into the Swissair hangar by Powell. Belvedere examined a small safe which was believed to contain a decoder key and combinations for the main vault. He then inspected the main safe and discussed breaking through a wall with a sledgehammer so that he could gain access to the wiring of the alarm system and bypass the said alarm. Belvedere indicated he had tools which would enable them to do the job in 15 minutes.

Later that morning Mazzapella called Powell and told him they wanted to "come in that night". At 11:15 P.M. Powell met Belvedere at a diner. At 11:30 they entered a car and were joined by Mazzapella and by defendant Leichtweis, who was carrying an attaché case. En route to the airport, Belvedere discussed the job with Powell. Belvedere told him that in five years, "when it's all over," his share would be sent to him. Belvedere advised him that in order to make it "look good" he would shackle him and take his gun. The other security guard would be tied and dropped off at the edge of the airport.

Upon their arrival at the hangar, the four men entered the building via a loading platform. They walked toward the main vault but were stopped by the police some 25 to 50 feet before they reached their destination. The attaché case was found to contain a number of tools including home-made gear for "exploring a circuit," a C clamp used to make a ground connection, a hand set, such as is mainly used by telephone repairmen, and jumpers which could be used to bypass a circuit.

Defendants were indicted for burglary in the third degree, attempted grand larceny in the second degree, conspiracy in the third degree and possession of burglar's tools. Subsequently, defendant Belvedere made an omnibus motion which sought, *inter alia*, inspection of the Grand Jury minutes and

dismissal of the indictment.* Criminal Term granted the motion to the extent of dismissing the burglary and attempted grand larceny counts of the indictment. The burglary count was dismissed upon the ground the respondent's entry into the hangar "was with the consent of the security agent and his superiors." The attempted grand larceny charge was dismissed upon the ground that the evidence adduced failed to show that respondent was "very near to the accomplishment of the intended crime." It is from the dismissal of these two counts of the indictment that the People appeal. We agree with their position; the burglary and attempted grand larceny counts should be reinstated.

■ "A person is guilty of burglary in the third degree when he knowingly *enters* or remains *unlawfully* in a building with intent to commit a crime therein" (Penal Law, § 140.20 [emphasis supplied]; see Hechtman, Practice Commentaries, McKinney's Cons Laws of NY, Book 39, Penal Law, § 140.20, p 35). On the facts of the instant case, a conviction for burglary would be *legally impossible* because the owner of the hangar, Swissair, had consented to entry by the defendants (see *People v Seligman,* 35 AD2d 591, mod on other grounds 28 NY2d 788; see, also, *People v Rollino,* 37 Misc 2d 14).

■ However, on a motion to inspect the Grand Jury minutes and dismiss the indictment, the court may dismiss only if there is insufficient evidence to sustain the crime charged or any lesser included offense (CPL 210.20, subd 1, par [b]; *People v Frisbie,* 40 AD2d 334). The crime of attempted burglary would constitute a lesser included offense in this case, notwithstanding the legal impossibility of a burglary (see CPL 1.20, subd 37; *People v Dlugash,* 41 NY2d 725, 737; see, also, *People v Legrand,* 50 AD2d 906). Legal impossibility as to the commission of the underlying crime is no defense to a charge of attempting to commit the crime, provided "such crime could have been committed had the attendant circumstances been as * * * [the defendant] believed them to be" (Penal Law, § 110.10).

■ It is noteworthy that prior to the 1967 revision of the Penal Law, legal impossibility as to the commission of the underlying crime was a defense to a charge of attempting to commit the crime *(People v Jaffe,* 185 NY 497; *People v Rollino,*

---

* The codefendants submitted an affidavit in support of respondent's motion requesting similar relief. However, the order appealed from applied only to respondent.

*supra).* The statutory change in 1967 was apparently based in large part upon the approach of the draftsmen of the Model Penal Code to eliminate the defense of impossibility in virtually all situations. "[T]he code suggested a fundamental change to shift the locus of analysis to the actor's mental frame of reference and away from undue dependence upon external considerations. The basic premise of the code provision is that what was in the actor's own mind should be the standard for determining his dangerousness to society and, hence, his liability for attempting criminal conduct" *(People v Dlugash, supra,* p 734). Thus, "[i]n the belief that neither [legal impossibility nor factual impossibility] * * * detracts from the offender's moral culpability * * * the Legislature substantially carried the code's treatment of impossibility into the 1967 revision of the Penal Law" *(People v Dlugash, supra,* p 735). Therefore, in the instant case, if the evidence before the Grand Jury was sufficient to establish that respondent *believed* he was entering the hangar unlawfully—i.e., without consent of Swissair—with intent to commit a crime therein, it was error for Criminal Term to have dismissed the indictment for burglary.

We believe the requisite mental culpability was sufficiently established by the testimony before the Grand Jury. Assuming, as we must, the veracity of the testimony before the Grand Jury, it is patent that respondent did not believe he had the consent of Swissair or its authorized representative to enter the hangar. Moreover, the evidence before the Grand Jury was more than adequate to support the inference that respondent intended to commit a larceny within the hangar. Accordingly, the count of the indictment charging burglary in the third degree was improperly dismissed.

*People v Seligman (supra)* is inapposite. In *Seligman* the defendants, appraisers retained by an urban renewal agency, solicited bribes from two property owners for inflating the appraisal of affected property. This court reversed their convictions of common-law larceny and attempted common-law larceny on the ground that neither of the property owners involuntarily parted with his money. It was noted that the essence of common-law larceny is the taking of property without the owner's consent. But in *Seligman* the owners not only voluntarily parted with their money, defendants *believed* the bribes to have been voluntarily given.

■ As to the count of the indictment charging attempted

grand larceny, the said count should not have been dismissed if (a) there was sufficient evidence to establish that respondent intended to commit a *specific crime* and (b) there was proof that respondent "acted to carry out his intent" (see *People v Bracey,* 41 NY2d 296, 300). We believe the first branch of this test was amply satisfied. The testimony before the Grand Jury did not merely establish an intent "to do some unspecified criminal act" (see La Fave and Scott, Criminal Law, § 59, p 429; see, also, *People v Bracey, supra).* Rather, defendants' target was a specific vault in a specific building. Indeed, Criminal Term's dismissal of this count was not based upon a lack of intent; it was addressed instead to the second requirement, i.e., a sufficient overt act.

Although Criminal Term correctly stated the standard to be applied, viz., whether respondent was "very near to the accomplishment of the intended crime" (see *People v Di Stefano,* 38 NY2d 640; *People v Rizzo,* 246 NY 334), we disagree with its application of that standard to the facts of the instant case. A number of facts militate toward this conclusion. One or more of the defendants reconnoitered the premises and the vault to be opened on a number of occasions. While these actions might not, in and of themselves, constitute a sufficient "overt act", a certain "firmness of purpose is shown when the actor proceeds to scout the scene of the contemplated crime in order to detect possible dangers and to fix on the most promising avenue of approach" (Wechsler, Treatment of Inchoate Crimes in Model Penal Code of Amer Law Inst: Attempt, Solicitation, and Conspiracy, 61 Col L Rev 571, 598-599).

In addition, defendants were not only in possession of the tools needed to accomplish their intended crime, but they possessed these tools within 25 to 50 feet of the main vault (see *People v Sullivan,* 173 NY 122, 135; see, also, *People v Lawton,* 56 Barb 126). Finally, defendants had already effected what they believed to be an unlawful entry into the premises to be burglarized and were, figuratively if not literally, within sight of their goal (see Wechsler, *supra,* p 599; cf. *People v Rizzo, supra,* pp 338-339). Under these circumstances, the count of the indictment charging attempted grand larceny should not have been dismissed.

Finally, we would add that the foregoing analysis as to the sufficiency of the first two counts of the indictment assumes the truth of the testimony presented to the Grand Jury. At the trial, of course, factual questions may be presented as to

whether defendants believed their entry into the hangar to be unlawful and whether they were "very near" to the accomplishment of the alleged intended larceny.

HOPKINS J. P., LATHAM and RABIN, JJ., concur.

Order of the Supreme Court, Queens County, dated April 5, 1977, reversed insofar as appealed from, on the law, and the first and second counts of the indictment are reinstated.